Filed 5/20/13  P. v. Juarez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MANNIE JUAREZ, JR.,<br><br>    Defendant and Appellant. | 2d Crim. No. B239807<br>(Super. Ct. No. KA095140)<br>(Los Angeles County) |

Mannie Juarez, Jr. appeals a judgment following conviction of voluntary manslaughter, with a finding of personal use of a deadly weapon.  (Pen. Code, §§ 192, subd. (a), 12022, subd. (b)(1).)[1]  We affirm.

*FACTS AND PROCEDURAL HISTORY*

In the early evening of August 7, 2011, Ricardo Vargas attended a neighborhood gathering at a Garo Street residence in Hacienda Heights.[2]  Juarez, Caroline Lucero, and several young women sat on chairs in the driveway.  Lucero was intoxicated and "very affectionate with everybody."  Ricardo knew the residents and many of the guests, but did not know Juarez.

---

[1] All statutory references are to the Penal Code unless stated otherwise.  References to section 12022 are to the version in effect prior to January 1, 2012.

[2] We shall refer to Ricardo Vargas and the victim, Eduardo Vargas, by their first names not from disrespect, but to ease the reader's task.

Eduardo, Walter Martin, and Robert Valdez arrived after attending a pool party. The women sitting in the driveway teased the men for not inviting them to the pool party. Lucero was excited and attempted to hit Martin in the face, but struck him in the shoulder instead. Martin responded: "What the hell was that? What's wrong with you." He recognized that Lucero was intoxicated, however, and walked away.

Eduardo then walked in the driveway and Lucero struck him twice in the chin and tore his shirt. Eduardo responded: "What the hell did you do that for? You ripped my shirt, Caroline." Eduardo was "dumbfounded" by Lucero's actions and tried to "bear hug" her.

Juarez "snapped," and pushed Eduardo, stating that Lucero was his friend. Eduardo responded, "Hey, you don't know me like that. Who the hell do you think you are? Why did you push me? Who are you?" Juarez moved to push Eduardo again, but Lucero interceded and pulled Juarez away.

Ricardo then informed Juarez that "This is family," and "We don't fight here." Juarez taunted Eduardo and stated, "What's up? What's up fool? Come back." Ricardo, Eduardo, and Martin then decided to leave the party. As they walked home, they heard Juarez state, "Fuck this. I want to fuckin' fight. I'll fuck him up."

Suddenly, the men heard loud voices, turned around, and saw Valdez punch Juarez in the face. Juarez fought back and kicked at Valdez. Valdez yelled at Juarez to "[g]et off my property." Eduardo, Ricardo, and Martin then ran back to the gathering and approached Juarez. Martin nudged or pushed Juarez on the shoulder and ordered him to leave. At the same time, Juarez "lunged forward" and stabbed Eduardo near his heart with a "punching motion."

Eduardo stated that he had been stabbed, and revealed a large stab wound in his chest. Thereafter, he fell in the driveway and died.

Valdez then struck Juarez in the face and threw a child's bicycle at him. Juarez stated, "Fuck you," and ran down the street. Valdez, Ricardo, and Martin followed Juarez in Ricardo's automobile. When they saw Juarez, he was walking "like nothing had ever happened." Juarez turned and saw that the men were in pursuit. He ran to the

residence of Alberto Rosas and "bang[ed]" on the front door and tried to force his way inside the home. Rosas saw Juarez throw a knife into his backyard.

Meanwhile, Ricardo stopped his automobile and Martin obtained a tire iron from the trunk. Police officers quickly arrived in response to Rosas's telephone call. Martin returned the tire iron to the trunk of the automobile. Ricardo later made a field identification of Juarez.

Police officers recovered the knife from the Rosas backyard. Later DNA laboratory testing established that blood on the knife blade matched Eduardo's DNA profile. Officers also found the knife's sheath in the front yard. It had been modified to remove a button wrap meant to hold the knife in place. The knife measured nine and one-half inches long, with a blade length of five inches.

Following Juarez's arrest and advisement of rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, police officers interviewed him. Juarez admitted taking a knife with him to the Garo Street gathering because he had argued previously with one of the Valdez brothers.

Doctor Cho Lwin, deputy medical examiner for Los Angeles County, performed an autopsy on Eduardo's body. He opined that Eduardo died from a fatal stab wound that penetrated the subclavian artery. Lwin also opined that Eduardo was stabbed by a forward pushing motion.

At a pretrial court hearing, Juarez winked at Ricardo and mouthed "You're dead" to him. The trial judge presiding over the hearing warned Juarez not to wink at or communicate with audience members.

The jury acquitted Juarez of murder but convicted him of voluntary manslaughter. It also found that he personally used a deadly weapon. (§§ 192, subd. (a), 12022, subd. (b)(1).) The trial court sentenced Juarez to a 12-year prison term, consisting of an upper term of 11 years for the manslaughter conviction, and one year for the personal weapon use finding. The court imposed a $2,200 restitution fine, a $2,200 parole revocation restitution fine (stayed), a $40 court security assessment, and a $30 criminal conviction assessment, ordered restitution, and awarded Juarez 246 days of

custody credit.  (§§ 1202.4, subd. (b), 1202.45, 1465.8, subd. (a)(1); Gov. Code, § 70373.)

Juarez appeals and contends that the trial court erred by not instructing regarding the lesser-included offense of involuntary manslaughter under theories of misdemeanor manslaughter and the use of excessive force in self-defense.

## DISCUSSION

### I.

Juarez argues that the trial court erred by refusing an instruction regarding involuntary manslaughter based upon the misdemeanor crime of brandishing a weapon. (§ 417, subd. (a); e.g., *People v. Thomas* (2012) 53 Cal.4th 771, 814 [involuntary manslaughter may be committed when firearm fires accidentally during struggle].)  He points out that he requested the instruction based upon the theory that "the knife . . . was swung . . . not to kill [but] to ward off the attacker."

The trial court must instruct upon lesser-included offenses sua sponte whenever there is substantial evidence raising a question whether every element of the charged offense is present.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)  Conversely, even on request, a trial court has no duty to instruct on any lesser-included offense unless there is substantial evidence to support the instruction.  (*Ibid.*)  Speculation is an insufficient basis upon which to require an instruction concerning a lesser-included offense.  (*People v. Valdez* (2004) 32 Cal.4th 73, 116.)  Rather, substantial evidence – evidence that a reasonable jury could find persuasive – must exist.  (*Ibid.*)  We independently determine whether the trial court was required to instruct regarding a lesser-included offense.  (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

Involuntary manslaughter is committed either by "an unlawful act, not amounting to felony" or by committing "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  (§ 192, subd. (b).)  Involuntary manslaughter is an unlawful killing without malice, without an intent to kill, and without a conscious disregard for life.  (*People v. Cook*, *supra*, 39 Cal.4th 566, 596; *People v. Butler* (2010) 187 Cal.App.4th 998, 1006-1007; CALCRIM No. 580.)  One of

4

three acts may support a judgment of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony. (*Butler*, at p. 1007.)

Here the trial court refused the involuntary manslaughter instruction, stating that Juarez acted with "a dead shot straight into the chest with a stabbing instrument." The trial court properly refused the instruction because there is no substantial evidence that Juarez committed this lesser offense. (*People v. Thomas*, *supra*, 53 Cal.4th 771, 813 [statement of general rule].) Thus no evidence exists that Juarez showed or displayed the knife with the intent of frightening Valdez or Eduardo. Moreover, witnesses to the stabbing testified that Juarez "lunged" at Eduardo, creating a knife wound with a "punching motion" that deeply penetrated his chest near his heart. The witnesses to the stabbing were surprised by Juarez's attack and seemed unaware that he had a knife. In sum, there is insufficient evidence of misdemeanor brandishing to have warranted the involuntary manslaughter instruction.

## II.

Juarez contends that the trial court erred by not instructing sua sponte regarding involuntary manslaughter based upon the use of excessive force in self-defense. He claims that this theory satisfies the statutory definition of "the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Juarez relies upon *People v. Blakeley* (2000) 23 Cal.4th 82, 91, holding that "a defendant who kills in unreasonable self-defense may sometimes be guilty of involuntary manslaughter" but that a defendant "who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter."

Our Supreme Court in *People v. Blakeley*, *supra*, 23 Cal.4th 82 discussed the relationship between imperfect or unreasonable self-defense and voluntary and involuntary manslaughter. "[W]hen a defendant, acting with a conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary rather than involuntary manslaughter." (*Id.* at p. 91.) Nothing less than a conscious disregard for life can be found from evidence that Juarez stabbed Eduardo in the chest most likely to the

5

bottom of the five-inch knife blade, with a single lunge, punch, or swing. Although Valdez, Ricardo, and Martin demanded that Juarez leave the gathering, he did not do so until after stabbing Eduardo. A person who intentionally uses a deadly weapon against another has acted with either an intent to kill or a conscious disregard for life. (*People v. Colantuono* (1994) 7 Cal.4th 206, 219 ["if one deliberately employs a lethal weapon . . . with actual or presumptive knowledge that if utilized in the manner in which it is being used the infliction of serious bodily injury to another is very likely to occur, he is presumed to have intended the natural consequences of his deliberate act"].) No instruction concerning involuntary manslaughter was required. (*Blakeley*, at p. 91.)

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.


We concur:



YEGAN, J.



PERREN, J.


6

Bruce F. Marrs, Judge

Superior Court County of Los Angeles

_____

Mark J. Shusted, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.